All right. Do we have counsel for case number one here? Yes. Susan Gashell is here. Excellent. So case number one, which we are taking third, is the State of Wisconsin Department of Workforce Development against, I guess nominally, the Secretary of Education and the Department of Education and Teresa Taylor. So, Ms. Gashell, you may proceed. Thank you for the opportunity to present oral argument. May it please the Court, I represent Teresa Taylor, who is a blind vendor operating vending facilities in Wisconsin under the federal Randolph Shepard Act. I would like to reserve five minutes of my time to address Mr. Kilpatrick's arguments on behalf of the State of Wisconsin. With respect to the errors of the district court, they are numerous. The first most glaring error is its decision that the vending facility, all vendors who applied for the position at the vending facility, should have participated in the arbitration. This would effectively moot the arbitration. With some of the more successful and the more lucrative vending facilities, you could have as many as five or even ten applicants. Could I maybe recast what I at least understood the district judge to be saying? I thought he wasn't so much saying that everyone was supposed to participate in the arbitration, but he was saying that if the arbitral award goes so far as to confer the contract on someone, that would be a problem because there are more than two interested applicants. And so it was a way of saying the arbitrators went too far with the award. Had they, for example, remanded this matter back to the Department of Workforce Development and said there are problems with this, you need to redo it in some format that looks at the competing applications of many. I think that was what I understood them to be saying. And I do believe that the arbitration panel did not do that for the simple reason that the state of Wisconsin had already, on two different occasions, conducted interviews and fashioned interviews in a way that there was no possible way that Ms. Taylor could prevail. In the first interview, they refused to accept her. Before we back up, though, do you agree that there were more applicants than just Ms. Taylor and I forget the other lady's name. Ms. Belsha. Yeah, Ms. Belsha. Yes, there were more applicants. Right, okay. So just incorporate that thought in your comments. If the case was remanded and all of the other applicants could re-interview, we would have had the same result. Because the state of Wisconsin had already decided that Ms. Belsha was going to be awarded that facility. That was evident from the testimony given by the state's representative at the full evidentiary hearing, which we don't have an audio video of or a video or even an audio recording of, because the state didn't bother to get equipment that worked, and that's in the record. Ms. Gashel, on this point, perhaps you're right, it's a predictive matter. But I thought that, or a practical matter, but I thought that your adversary was arguing that the arbitration panel has authority that's cabined or that's limited, and that is that it extends to resolving the dispute that's put before it in a finding and binding decision, but that the Wisconsin Administrative Code leaves decision-making authorities with respect to the selection of vendors to whatever that division's called, the rehabilitation division or whatever. That is correct in the ordinary course, but arbitration is a remedy that is designed to provide a great deal of latitude to its participants. In this case, if we would have remanded the case back, we would be here maybe two years down the road since this case has been pending since 2011, and we could definitely be caught in an endless loop of arbitrations. The panel could see that the Division of Vocational Rehabilitation was determined to install Ms. Belsha. It was obvious from the record, and the only remedy that it could see, which it's under its broad remedial powers as an arbitration panel, would be to install Ms. Taylor. So the one question that I have that I want to make sure that you get to is your client seems to have dealt you a tough hand in this regard. She just chose not to participate in the 2013 re-interview process or largely not to participate. Isn't that a difficult fact for you? I don't think so, given the facts of this case. She contacted the Division of Vocational Rehabilitation, and she said, are you going to consider my profitability margins from 2011 when I operated the lucrative facility, or are you going to consider my profitability margin, which her income had gone down by about almost 50%, from now? And they said, we're going to consider your profitability margins from now, which means because Ms. Belsha had been installed in October 11, 2011. She had been installed in operating the more lucrative facility since then. Her profitability figures were going to be way higher than my clients, and because only a few points ever separated the two of them, there was no possible way she could prevail. She decided not to perform a futile act, which was reasonable given the circumstances. But was there a big difference? Tell me a little bit more about these questions and the performance component, because they seem to be in bands, like three points for 0 to 40%, two for 40.01 to 50, and one for greater than 50. And I thought your client wasn't sure how she would have scored on that, and with these bands, maybe it wouldn't have been such a difference. No, it would have created enough difference to make the difference in the score. Just a point or two, though, right? I mean, so other factors were important, too. No, they only considered scoring. They did not consider letters of recommendation or participation in other aspects. The only thing they considered in that was the scoring. They made it based solely on scoring, and the director of the program, the only witness that the Department of Rehabilitation brought forth at the arbitration hearing, said they now accept letters of recommendation, and she had no idea why the policy at that time was not to accept letters of recommendation. Well, I mean, you know, this is not in my experience, but I thought for the new ones, the ones that, as Judge Scudder points out, she chose to stand away from, had sections with different points, so a testing component, 15 questions, two points each, an interview by the time you finished, 25 points, performance review, 45 points. So there were a number of factors in 2013, right? Yes, and she would have done well on all of them except for the profitability factors. But how do we know that, since she didn't participate? Well, she had done well on all her other interviews, and with respect to the first interview, there were evident cross-outs made in the interview tally sheets, and the interview was constituted with two blind individuals, members of the State Committee of Blind Vendors, and one staff person. Well, the blind people couldn't have crossed out and changed the scores because they couldn't see the documents to do so. So it had to be the staff that changed the scores. So at that point, once she knew that they were going to consider the profitability factors from 2013 and not 2011, which were relevant, the only profitability factors that were relevant, she knew that it was futile for her to participate in the interview. And that was explained well to the arbitration panel, and the arbitration panel agreed that there was no point in her going forward with the interview. And there was no testimony to the contrary or no evidence put on to the contrary. So is her view—these are my words, obviously, not yours and not hers— is her view basically that when—what's this fellow's name? Greco, Michael Greco. When this Greco fellow decided that we're going to go forward with new interviews and a new decision-making process in 2013, and that we would ask for current, freshened-up profitability and cost-of-sales data, that the deck was stacked? Yes, that's her view. That's her view. Okay. And so she's basically saying that the decision to reopen, revisit, re-interview, whatever you want to call that, that's where the legal error occurred, because at that point everything was stacked against her. Yes. Do you want me to address the sovereign amenity argument for a few minutes? You can either do that, or I guess I have a broader question. It seems to me that the way this Wisconsin Department operates these contracts is not a 100% merit-based system. It seems to me they also have a criterion where they're trying to equalize the positions of various vendors and trying to give everybody an opportunity to have some work. And I wonder whether it's your position that federal law is somehow violated by that goal on the state's part, whether nothing but a pure meritocracy will do. That is not my position. My position is that they have two sections, and I might reverse these, 607 and 608. One of them, and I did make a note of it, I believe it's 607, but I'm not positive about this, provides for a vendor who's been displaced through no fault of their own to be given preference. But they didn't follow the provisions on that. One of the provisions is they're put on six months probation, and the committee is more involved in the process. They didn't follow that. They followed the merit-based procedure in this case. So that is something that was not even addressed by the arbitration panel, was not argued by the state in the arbitration, but was merely discovered by the district court judge in going through, apparently looking at the regulations. Well, the reason I ask that is because your whole case really hinges on the fact that the process that the Division of Vocational Rehabilitation of the state agency followed was a flawed process because she had proven her qualifications by taking over on very short notice some time back. She had successfully been operating these places, and had somebody been willing to read this letter of recommendation, it would have been clear that maybe there was even more information than was in the file. You know, a whole lot of things. Your point is she was the better person for this contract. But if the state wants to have a policy of spreading employment out and says, actually, ultimate merit isn't our only goal, we're trying to get employment for a number of people, I don't know why a state can't have that policy. I don't know why that's invidious discrimination against anybody. So I'm just trying to get to the fundamental question. Are we dealing with a federal law problem here? Does that violate, for example, the Randolph Shepard Vending Facility Act? Does it, you know, what's the ultimate legal problem that you're focusing on? Per se, I do not believe it does violate the federal Randolph Shepard Act. But in this case, they did not follow their merit-based or their non-merit-based. Yeah, their need, they didn't follow the needs-based criteria in this case. All right. But are you, because if you're saying the state agency didn't adequately follow state law, we may have a problem. Well, they did not select the best suited operator for the facility, and that is what is required under their statute. Or perhaps it's a regulation. I'm sorry. Okay. Exactly. But they're supposed to select the best suited operator. And then they have these different policies to go through to do that, but they have the one carved out for if a vendor has lost a significant amount of income. But they didn't use that policy. Matter of fact, at the very top of the criteria for the second interview, it says according to the merit-based policy. It doesn't say those words, but it cites the division of their regulation that is merit-based. Okay. So basically you're saying, and thus it was arbitrary and capricious, which is what the arbitration panel thought as well. What about the arbitration panel's failure to apply the preponderance of the evidence standard? Doesn't that undermine? Well, I think it's a little more nuanced than that. It's substantial evidence, but preponderance comes through, and I argued this in my reply brief, only if the state prevents countervailing evidence to the evidence presented by Ms. Taylor. Well, the state brought forth only one witness and very few documents that were at all relevant, and its witness had no knowledge of the facts of the first. The 2011. The 2011, and very little knowledge. As a matter of fact, she didn't even have knowledge of the 2013. The staff didn't even tell her that this case was up for arbitration, and she learned about it, and she testified to this when she got a letter from the United States Department of Education saying, why aren't you guys moving forward with this arbitration? So they did not present any witnesses that had any knowledge whatsoever about this. And as you may be aware, the arbitration panels have no subpoena authority. So when a blind vendor goes into arbitration, the blind vendor has to rely to make its case on whatever witnesses the state makes available. Okay. Well, if you'd like to save that bit of time for rebuttal, this is probably a good time. Thank you. Mr. Kilpatrick. Thank you, Your Honors. Good morning. May I please the Court? My name is Stephen Kilpatrick. I am an Assistant Attorney General with the Wisconsin Department of Justice representing FLE State of Wisconsin, Department of Workforce Development, Division of Vocational Rehabilitation. This Court should affirm the decision of the District Court, which vacated a decision of an ad hoc arbitration panel convened by the Secretary of the Department of Education. That ad hoc panel's decision concluded that the State of Wisconsin's decision to award a contract as to the combined facilities, we'll call them, to a blind vendor applicant, Ms. Belsha, was wrong, and as a remedy removed Ms. Belsha from the contract and instead selected Ms. Taylor. The panel took this action, though, without any legal foundation to remove an operator selected by the state that went through the proper process. Does it matter? I mean, there is an overtone here. Maybe I'm reading something into this, but maybe not. I want to say almost favoritism or just, you know, we're going to put you in this facility and we're going to put you in this other less lucrative facility, and now we need to balance it out. It seems very ad hoc and really rife with possibilities for arbitrary decision making, and that seems to be what has frustrated Ms. Taylor because she had been doing the work and earning the money, and all of a sudden, for reasons that looked quite arbitrary to her, the state pulled the rug out from under her. Yes, Your Honor, and that's why the state redid and redid the process. At the 2011 selection process, Ms. Taylor filed a grievance and went to a full evidentiary hearing, and the panel decided and recommended to Mr. Greco, the administrator, that it should be redone, and that's exactly what happened. But what about putting Ms. Belsha in as the interim person? So I want to ask you about that, and also, you know, she argues that this redo itself was kind of doomed from the start. Right. She focuses on two questions out of several that were worth nine points out of 100 regarding some performance in history, and she takes issue with the state using 2013 data instead of 2011 data, and it's our position that the state wanted to use the most up-to-date data that was available at the time of the new selection process. That was in 2013. And at that point, because Ms. Belsha had been selected after the 2011 selection process, the administrator, Mr. Greco, decided let's not have more change and keep Ms. Belsha in as interim operator, never appointed her as permanent operator. The decision of his from June 12, 2012 said Ms. Belsha will continue as the operator during the new selection process, so during the new selection process was 2013. Mr. Kilpatrick, isn't on this particular point, I know that there's only nine points that are allocated to cost of sales and profitability in the aggregate, but isn't Ms. Taylor's point that, hey, look, this is happening in 2013 at a time when I don't know what these things are called, prison facilities or whatever the term is. And she said that's what dooms this for me because the prison facilities are more profitable than the non-prison facilities, whatever the right lingo is. And she said so that's what the deck is stacked. I mean, yeah, that's what he decided, but that's completely arbitrary, and that's going to lead to an outcome that is surely not in my favor, so I'm not participating. Right. Well, for one thing, she should have participated in the selection process. That leads to the problem. But toward what end? That's her point. Toward what end? Just for the heck of it? No. So getting back to those questions, Ms. Taylor didn't provide other than her own testimony and her belief that prison facilities, prison sites were more lucrative. And the evidence going from what she provided in 2011 when she applied showed that a non-prison site, the Southern Wisconsin Center, had a 23% net profit percentage. That was as to question six. And then during the arbitration panel hearing, I believe, is when she submitted evidence that in 2011, I'm sorry, 2011 there was a 24% net profit. That was prison. Then in 2013, 23% non-prison. So there was not a significant distinction between 23% and 24%. And I believe, as Judge Wood pointed out, question six has these ranges. So you get four points between 20% and 24.99%. So it's the state's position that she would have received four points either way with regard to if she had participated and provided evidence regarding those two different years in 2011. In other words, 2013 is neither here nor there because the data, at the end of the day, they both fall below 25%. Correct. Mr. Kilpatrick, going to those 2013 re-interviews, was Mr. Faple, I think he's been cast as one of the darker characters in the drama, is Mr. Faple involved in those 2013 interviews and afterwards? No, he wasn't. And that's one point that I do want to raise, Judge Brennan, is that 2011 interviews, Ms. Taylor seems to point back to those throughout her brief. And those, it's our position, are completely irrelevant. The 2011 interviews process was wiped away clean when Mr. Greco decided that there needed to be a redo, as we want to call it, in 2013. So Mr. Faple, who Ms. Taylor testified at the arbitration hearing, had told him that he was going to provide or give the contract to Ms. Belshook and she deserved it, wasn't involved. And also, the full evidentiary hearing panel, which made recommendations to Mr. Greco for 2013, had decided that there would be a merit-based decision and there would not be a social need decision. So that gets to Judge Wood's previous question about merit-based, and it sounds like the parties are all in agreement that this was a merit-based procedure, a selection process, and there was not any social need aspect to it. So in that sense, it was not, the deck was not stacked against Ms. Taylor. And for that reason, she should have participated in the process in 2019. And that gets to my point with regard to the arbitrary and capricious aspect of the panel's decision. So what the panel did was usurped the state's role and the state's statutory and regulatory authority to select the operator of the sites. And that's exactly what it was trying to do and what it did in 2013 after the redo and selected Ms. Belshook. Ms. Taylor chose, for whatever reason, not to participate in that selection process. So there was no way that she could have been awarded the contract after that 2013 process. So then what she tries to do is go to an arbitration panel hearing and get the award that way through not participating in the selection process. And so it's our position that the arbitration panel did not have the statutory authority, did not have any authority, to usurp the authority of the state in selecting the best suited operator for these combined facilities. And that was one error in the panel's decision. Mr. Kilpatrick, can you shed some light for me just because I'm curious about it on this, what strikes me is extremely bizarre position that the department was taking on letters of recommendation. I gather this was not part of the 2013 process, but it still seems as peculiar as anything I've ever heard of. And I'm sorry for not expanding on that in the briefs. I don't have references in the record right now. But if you read the arbitration panel decision and the dissent, it makes reference to a DVR, Division of Vocational Rehabilitation, policy that would say when appropriate, each candidate will be asked to bring a resume and two references to the interview. And so what happened was that the department decided that it was not appropriate to ask those applicants to bring their resume, two references to the interview, and that when Ms. Taylor decided to bring hers, that it made the decision, well, we haven't asked any of the other applicants to do so. So it would be unfair to allow hers to come in. And the state's position, I think the district court got it right. There's nothing arbitrary and capricious about that. It had decided that it was the state that it was familiar with the applicants, Ms. Belsham, Ms. Taylor, and that it was not appropriate or necessary for those to come in. Also, Your Honor, with regard to one of the other bases for the decision of Mr. Greco, the arbitration panel said that Mr. Greco and the state dropped the ball by a long delay between his decision and the 2013 interviews. What the panel forgot about completely was the need for the state to go and seek the active participation of the elected committee for the blind. That is a committee that provides input when there are some changes to the procedures. And that's what exactly happened in 2013. Mr. Greco decided, appropriately, to seek input from the committee. That took some time. It took a few months. And for that reason, there was a delay between his decision and the re-interviews. Do you have any explanation for the changes, the handwritten modifications to the forms? That sounds a little irregular as well. I do not, Your Honor, and I'm not sure if that was even part of the 2013 application process. Again, it's our position that anything from 2011 is irrelevant to the decision, because even if Mr. Feigl had been a part of that and showing any bias in 2011, he wasn't part of the 2013 process. And again, during the 2013 process, nothing was taken into consideration from that 2011 process. And you're saying there was no such taint on the 2013 process? That's correct, Your Honor. And if I may then also with regard to the arbitrary and capricious aspect of the panel's decision to replace and remove Ms. Belsha and install Ms. Taylor. Again, arbitrary and capricious. Expanding a little bit as to the distinction here between what happened and the decision from the Tenth Circuit in Tyler. Ms. Taylor says that Tyler allows exactly what happened here by the ad hoc arbitration panel. But there is a very important distinction. In Tyler, the Tenth Circuit Court of Appeals had a strong record. It understood who came in first, second, third, and fourth because everybody had applied for the selection process. The first person who the state of Oklahoma had originally decided to award the contract to had some unpaid tax problems and for that reason was unable to be selected. Second place was the intervener who would be somebody akin to Ms. Taylor here. And the Tenth Circuit Court of Appeals looked at the scores, saw that that intervener had come in second and far ahead of third and fourth place applicants. And decided that the ad hoc arbitration panel had some authority to issue a remedy that would install that second place applicant to the contract. And that's not what happened here. Again, because the 2014 process took place and Ms. Taylor did not participate, the ad hoc arbitration panel didn't have any evidence with regard to how her application would be compared to the others. So it's our position that the Tenth Circuit decision in Tyler with regard to the power of an ad hoc arbitration panel is not applicable here. But getting to Tyler, we will take the position that it was correct on the sovereign immunity aspect. Ms. Taylor's argument seems to be that simple participation in the Randolph-Shepard Act program is enough to waive the state of Wisconsin's immunity from money damages in such a case and allows the panel to award damages to Ms. Taylor. As we just explained in the brief, that is not the position of case law right now. It's our position that Ms. Taylor cites cases that are no longer good law. A primo decision from the Ninth Circuit and even from 1997 and an even older decision, I believe, from New Hampshire. Right now, the Supreme Court certainly requires that there be express language to put states on notice that they would be waiving sovereign immunity as to money damages in any statute choosing to participate in a program. The Randolph-Shepard Act statute does not have any express language putting any of the states on notice. They would be waiving their immunity to money damages in an award from the ad hoc arbitration panel. Here, the award was over, I think, $105 per day from the date that Ms. Taylor was not placed in that position as operator. I believe now that is over $350,000. And there was no notice to the state of Wisconsin that it would be subject to such ad hoc arbitration panel awards simply by participating in the Randolph-Shepard Act program. Same thing goes with the attorney's fees aspect. The ad hoc arbitration panel awarded attorney's fees and costs to Ms. Taylor. Not only is there—there is, again, no express language with regard to attorney's fees even in the statute, and the Tyler decision from the Tenth Circuit pointed that out. If I have no other questions, then I just would like to say that I ask that this court affirm the district court decision in its entirety. All right. I see none, so thank you very much. Anything further, Ms. Gashel? Yes, I'd like to respond to a couple of points, but first of all, I would like to state, why should arbitration be any different for a blind person in the Randolph-Shepard program than it is for any of the other instances where arbitration is called for? Arbitration has always had a well-established meaning, and the Sossaman case simply does not apply because the agreement to participate as the state licensing agency, the voluntary agreement, is just the unequivocal consent to the waiver of sovereign immunity. And I understand that the states are concerned about the high costs, but what has happened in the state of Wisconsin is ever since 2009, when the previous district court case came down, granting the states relief from any remedies other than prospective relief, is that the state of Wisconsin has, as is evidenced in this case, just done whatever it wanted to do. It doesn't grant interviews. Let me just jump ahead. She was appointed as permanent operator. Ms. Gashel was October 11. My client provided over 100 pages of financial information to the panel, so they had the information to see the difference in the earnings. In addition, she testified that she had allegations for storage facilities. She had ongoing leases that she had to continue to pay, and also obligation for equipment that she had to pay. The fact that Mr. Faithfull was not involved is completely irrelevant because it's DVR itself that was biased, and we don't know what Mr. Faithfull was told to do or what not to do. And in terms of why was it necessary to change the interview criteria, if they had conducted the interview as required by the 2010 criteria, then we wouldn't be here today. But they went through a long, lengthy process to change the interview criteria, so it would be skewed in favor. And the fact that they didn't ask for references does not mean that those people who did not bring references should have their good recommendations and their hard work ignored by the arbitration panel, especially given that the arbitration panel in the first interview was not constituted as is required by the policy. So, again, I thank your honors for the opportunity to present oral argument in this case. Well, thank you, Ms. Gashel. Thank you, Mr. Kilpatrick.